IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SCOTT ALLEN GODESKY, | ) | |
|     Petitioner, | ) | Civil Action No. 2:03-cv-1705 |
| | ) | |
| v. | ) | Judge Susan Paradise Baxter |
| | ) | |
| FRANK D. GILLIS, et al., | ) | |
|     Respondents. | ) | |

## **MEMORANDUM**

Pending before the Court[1] is the amended petition for a writ of habeas corpus (ECF No. 68) filed by state prisoner Scott Allen Godesky ("Godesky") pursuant to 28 U.S.C. § 2254. He is challenging the judgment of sentence imposed upon him on April 3, 1997, by the Court of Common Pleas of Allegheny County at criminal docket numbers CP-02-CR-6453-1996 and CP-02-CR-9689-1996. For the following reasons, the Court concludes that Godesky is entitled to habeas relief and, therefore, it will issue a conditional writ order.

### I.

**A.**     **Relevant Background**

The background of this case is lengthy and complicated. The following is a discussion of only that which is necessary for the Court's disposition of the amended petition. (ECF No. 68).

**1.**     **The Victim, Brian Mirenna, Is Shot and Killed In February 1996**

On April 22, 1996, a man hiking in Moraine State Park discovered the partial remains of Brian Mirenna ("Mirenna"), who had been reported missing almost two months earlier, on February 29, 1996.

---

[1]     On September 14, 2018, the undersigned was sworn in as a United States District Judge. This action was reassigned to this Court's docket on September 17, 2018.

1

Mirenna's body had been dismembered and scattered in different locations. His severed head had bullet holes in it.

During their investigation, the police learned that David Lehrman ("Lehrman") had a party at his house the evening of February 28, 1996, the day before Mirenna was reported missing. By the end of the party, only Lehrman, Godesky, Mirenna, and Todd Erfort ("Erfort") remained at Lehrman's house. Mirenna was shot and killed that night. He was 21 years old at the time of his death, and Lehrman was around his same age. They had been friends for many years and were drug dealers in the Carrick neighborhood of Pittsburgh. Erfort, who was age 18 at the time, was a long-time friend of both Mirenna and Lehrman. They had only recently met Godesky (then age 24), who had been released from prison approximately seven months earlier after serving a sentence for theft crimes.

The Commonwealth charged Godesky and Lehrman in the Court of Common Pleas of Allegheny County with criminal homicide, robbery, criminal conspiracy, and abuse of a corpse. As for Erfort, the Superior Court wrote in its 1998 decision affirming Godesky's judgment of sentence that he "received immunity from the prosecution as a result of his cooperation with police during their investigation and his agreement to testify at trial for the Commonwealth." (ECF No. 51-4 at 23).

Godesky's trial, which was severed from Lehrman's, was held in January 1997.

### 2. Dr. Rozin's Trial Testimony

Dr. Leon Rozin, who at the time was the Chief Forensic Pathologist for the Allegheny County Coroner's Office, conducted the external examination of Mirenna's body parts and also performed the autopsy. He testified at Godesky's trial and described the four bullet wounds that he observed.

Dr. Rozin explained that Mirenna was struck in the head with two bullets that were fired from a handgun, such as a pistol. (Trial Tr. at 377, 385). One of the bullets entered near Mirenna's left cheek. A second bullet entered by his left ear and temple, and this was the fatal shot. (Id. at 371-73, 381).

2

Dr. Rozin testified that he did not find any soot or powder near the wound on Mirenna's left cheek, but did find soot around the wound to the left ear and temple. (Id. at 373-74). According to Dr. Rozin, the presence of soot near the latter wound, which was the fatal one, indicated to him that that wound was caused by a "close-range shooting[,]" with the gun being held "maybe a few inches" from Mirenna. (Id. at 374. See also id. at 382). He said that he could not testify as to the exact distance between Mirenna and the shooter because Mirenna's body had been in water and that would have caused at least some of the soot and powder to wash away. (Id. at 374, 382). He further explained that, normally, if no soot or powder is in or around the wound, that indicates that the gun was between 18 to 24 inches from the victim. (Id. at 382-83).

Mirenna sustained a third wound to his left wrist. This wound, like the two on Mirenna's head, was from a bullet fired from a handgun. Dr. Rozin testified that the bullet that caused this wound went entirely through the wrist. (Id. at 376-77, 384). He was not asked if this wound could have been defensive.

Mirenna also sustained a shot to his left foot. Dr. Rozin testified that it, unlike the others, was caused by a bullet fired from a shotgun. (Id. at 377-78).

### 3. Erfort's Trial Testimony

The prosecution's theory was that Godesky and Lehrman conspired to rob Mirenna and that Godesky shot and killed Mirenna during the robbery. According to the prosecution, Godesky, using a handgun (a .357 magnum pistol), was the one that fired the two bullets into Mirenna's head and Lehrman was the one that shot Mirenna in the foot with a shotgun.

Erfort's testimony supported the prosecution's theory. He testified that at the conclusion of the party held on February 28, 1996, only he, Lehrman, Mirenna, and Godesky remained at Lehrman's house. A little past 11:00 p.m., Erfort said, while he was walking down the stairs from the second floor,

he heard Mirenna "saying something like chill out or quit playing[.]" (Id. at 224. See also id. at 222). Erfort testified that as he entered the living room, he saw Lehrman standing near Mirenna with a shotgun in his hand. He said that Lehrman had just shot Mirenna in the foot and that, after Mirenna started to scream, Godesky shot him twice with the pistol. (Id. at 222-26). Erfort testified that Lehrman did not tell Godesky to shoot Mirenna. (Id. at 231). He further testified that, contrary to Godesky's defense, Lehrman did not cause the pistol to discharge by reaching for it when it was in Godesky's hands. (Id.)

According to Erfort, Godesky was probably "a foot or two" from Mirenna when he shot him. (Id. at 226). He also said that Godesky fired the shots within "seconds" of each other, (id.), and from the same distance:

> Q.  And what happened after the first shot from [Godesky]? What happened to [Mirenna]?
> - - -
> A.  [Mirenna] just–he started choking or something, and boom, [Godesky], he shot him twice like that, boom, boom. So [Godesky] shot him twice.
>
> Q.  Did [Godesky] move forward the second time...?
>
> A.  He just–boom, boom.
>
> Q.  So both shots were from the same distance?... Is that what you are telling us?
>
> A.  Yeah.

(Id. at 315).

Erfort testified that after Godesky shot and killed Mirenna, Godesky went through Mirenna's pants pockets and took out money (about $1500.00) and a Gucci chain. Godesky gave the money to Lehrman. Erfort testified that much of the money went towards replacing the blood-stained carpet in Lehrman's home, but that Lehrman did give Godesky $200.00 of it. (Id. at 262-64).

4

### 4. Godesky's Trial Testimony

Godesky testified in his own defense and he described his role in the shooting of Mirenna as an accident. He contended that he had no plan, alone or with Lehrman, to rob or shoot Mirenna. (Id. at 502-03, 518).

Under Godesky's version of events, after Mirenna said that he was leaving the party, Lehrman pulled Godesky aside, handed him the pistol, and told him that they were going to "stick [Mirenna] up[.]" (Id. at 501). Godesky admitted that he followed Lehrman's lead, but he testified that he thought Lehrman "was playing," (id.), because, throughout the evening, Lehrman had been "pointing [his pistol] at people," "playing around," "pointing it at people, telling them he would shoot them," and "laughing about it the whole time." (Id. at 499).[2]

Godesky said that Lehrman walked over to the television stand, picked up the shotgun, pointed it at Mirenna and told him to hand over his money. (Id. at 502). According to Godesky, Mirenna thought that Lehrman was joking too, and he did not immediately comply. (Id.) Lehrman then shot Mirenna in the foot. (Id. at 501-02). Godesky admitted that he pointed the pistol at Mirenna. He said that he was standing two to three feet away from him. (Id. at 502-03, 525-26). After Lehrman shot Mirenna in the foot with the shotgun, Godesky said, Mirenna put his hands up and Lehrman pumped the shotgun again but it was empty, so Lehrman threw it aside and told Godesky to give him the pistol. (Id. at 503). Godesky testified that Lehrman grabbed for the pistol and that caused it to discharge and fire the bullet that struck Mirenna on his left cheek. (Id. at 503-04). After that happened, Godesky said, Lehrman took the pistol from Godesky, leaned in closer to Mirenna, and fired the fatal bullet into his head. (Id. at 504).

---

[2] Godesky testified that Lehrman had been playing with his guns and someone told him to stop. Lehrman responded, "you think I'm playing[?]" and then fired his pistol into the wall "within a foot or two" from someone's head. (Trial Tr. at 499-500).

5

Godesky also testified that Erfort was downstairs when the shootings started and that Godesky had been talking to Erfort right before Lehrman shot Mirenna in the foot. (Id. at 501-03).

### 5. The Jury Finds Godesky Guilty of First-Degree Murder, Robbery, Abuse of a Corpse, and Conspiracy

In his closing argument, the prosecutor acknowledged that Erfort was "not a great human being" and that he avoided being charged with abuse of a corpse and hindering apprehension because the Commonwealth "needed a witness for you." (Trial Tr. at 609). The prosecutor urged the jury to credit "the crucial portions" of Erfort's testimony (id. at 609-10), which he argued supported a finding that Godesky conspired with Lehrman to rob Mirenna and that Godesky intentionally shot Mirenna in the head twice,[3] thereby committing first-degree murder. (Id. at 609-23). The jury convicted Godesky of first-degree murder, robbery, abuse of a corpse, and criminal conspiracy. On April 3, 1997, the trial court sentenced him to life imprisonment on the first-degree murder count, to be followed by consecutive sentences on the other counts, for a total aggregate sentence of life imprisonment with a consecutive term of 21-42 years' imprisonment.

Lehrman's subsequent trial was held in April 1997. A jury convicted him of second-degree murder, robbery, abuse of a corpse, and criminal conspiracy. He was sentenced to a life sentence on his second-degree murder conviction, to be followed by a consecutive term of 21-42 years' imprisonment.

### 6. Lehrman Confesses

In 2008, Lehrman came forward and provided a written statement in which he admitted, consistent with Godesky's trial defense, that he, and not Godesky, intentionally shot Mirenna in the

---

[3] The prosecutor also stated: "You also have the third shot in the wrist, which nobody, Todd Erfort, Scott Godesky, anybody, has any explanation for whatsoever. I suggest he is not going to add it because he's the guy with the gun. The more times you shoot somebody, ladies and gentlemen, the more you can infer a specific intent to kill." (Trial Tr. at 620).

*Continued on next page*

head. He further admitted that he told Godesky that he was only going to play a prank on Mirenna and pretend that they were robbing him. Lehrman also wrote that he and Erfort conspired to place false blame for Mirenna's murder onto Godesky. (ECF No. 54-1 at 30-37; Pet's Ex. 10).[4]

At that point in time, this federal habeas case was on appeal before the United States Court of Appeals for the Third Circuit. Godesky asked the Court of Appeals for a remand so that he could amend his habeas petition and raise a claim based upon the newly-discovered evidence of Lehrman's confession before the one-year statute of limitations for such claims (28 U.S.C. § 2244(d)(1)(D)) expired. The Court of Appeals granted Godesky's motion. (ECF No. 40). He then filed a motion with this Court for leave to amend his application for habeas relief. (ECF No. 41). This Court granted that motion and then stayed this case while Godesky litigated in state court his claim pertaining to Lehrman's confession under Pennsylvania's Post Conviction Relief Act ("PCRA"), 42 PA. CONS. STAT. § 9541 *et seq.* (ECF No. 42).

In 2011, following an evidentiary hearing at which Lehrman testified, the PCRA court judge denied Godesky's request for relief. (ECF No. 54-10 at 8; ECF No. 55-1 at 30-33). In 2013, the Superior Court of Pennsylvania affirmed the denial of PCRA relief. (ECF No. 55-8 at 1-18).

After that PCRA proceeding concluded, this case was reopened. In 2015, Godesky filed the amended habeas petition (ECF No. 68) that is now pending before this Court. In it, he raises two claims for habeas relief. In Claim I, Godesky contends that, as evidenced by Lehrman's confession: (a) he was convicted in violation of his due process rights because Erfort gave perjured testimony at his trial; and, (b) he is actually innocent of first-degree murder, robbery, and criminal conspiracy. In Claim II, Godesky contends that the prosecutor committed misconduct when he argued that the jury should

---

[4] Exhibit citations are to those documents admitted at the evidentiary hearing this Court held on January 4, 2019.

7

convict him of first-degree murder based on forensic evidence that showed that three shots (not two) were fired from the murder weapon (the pistol).

On June 12, 2017, the Court issued a memorandum and order (ECF No. 72) in which it explained that because the PCRA court judge was one of Godesky's direct appeal attorneys, he should have disqualified himself before rendering a decision. The Court further held that Godesky met his burden of demonstrating that the state court's decision to deny Claim I "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Accordingly, the Court held, Godesky is entitled to *de novo* review of Claim I and another evidentiary hearing.

The Court held the evidentiary hearing on January 4, 2019. Godesky presented the testimony of Lehrman, Jason Davis ("Davis"), Glenn Ford ("Ford"), and Dr. David R. Fowler ("Dr. Fowler"). Godesky subpoenaed Erfort as a witness, but he invoked the Fifth Amendment, refusing to testify on the grounds that he could incriminate himself. (ECF No. 143 at 8). Godesky admitted into evidence several exhibits, including transcripts of relevant state-court proceedings, Pennsylvania Department of Correction ("DOC") records for Lehrman and Davis, the curriculum vitae and proffer of Dr. Fowler, the autopsy report, prior affidavits and statements of the witnesses, and photographs of the crime scene and bullets recovered during the police investigation. The Commonwealth presented no witnesses. It introduced four prior statements given by Lehrman. (Id. at 126-27).

After the evidentiary hearing, each party submitted proposed findings of facts and conclusions of law. (ECF Nos. 150, 151). Godesky also filed a response to the Commonwealth's submission (ECF No. 152). Following a review of the testimony and the evidence, and considering the post-hearing submissions, this Court makes the following findings of fact and conclusions of law in accord with Federal Rule of Civil Procedure 52(a).

8

## B. Findings of Fact

The Court concludes that Lehrman, Davis, Ford, and Dr. Fowler gave credible testimony at the hearing in support of Godesky's request for habeas relief.

Lehrman testified that he and Mirenna had been close friends and sold drugs together. (ECF No. 143 at 12-15, 20). Erfort was also part of their group of friends, (id. at 14), and was "like a little brother" to Lehrman. (Id. at 19). According to Lehrman, Godesky was not involved in the drug business with Lehrman and Mirenna. (Id. at 21). Lehrman explained that Godesky was not part of the friend group and had only started to come around in late January or early February after his release from prison. (Id. at 21-22).

Lehrman testified that at the time of his party on February 28, 1996, he was upset with Mirenna and felt betrayed by him. (Id. at 16-17). He said that he felt that way because Mirenna tried to "buy [a car] from underneath" him. (Id. at 16). He also suspected that Mirenna "had something to do with" an incident in which Lehrman was robbed.[5] (Id.) Lehrman said that during the party, while people were present, he fired his guns in the house. (Id. at 23). He explained, "I was being an idiot, is what I was doing. I shot the .357 off into the wall. And then a few of us went down to the basement and shot my shotgun off into an empty cabinet." (Id. at 24).

Lehrman testified that at the end of the night, when just he, Mirenna, Godesky, and Erfort were in the house, he "pulled [Erfort] and [Godesky] into the hallway" and "told them I wanted them to go along with a prank; that I was going to pretend like I robbed–I was robbing [Mirenna]." (Id. at 24-25). He said that he gave Godesky the handgun, and not Erfort, because Godesky "had just gotten out of prison" and "it would be more believable" if Godesky had the gun "because everybody had a stigma that

---

[5] Mirena's girlfriend, Rani Huff, testified at Godesky's 1997 trial that Mirenna was aware that something was amiss in his relationship with Lehrman and he had been "staying away" from Lehrman for that reason. (Trial Tr. at 170).

9

come [sic] out of prison." (Id. at 27). Lehrman testified: "I told [Godesky] that–to point it at [Mirenna] when we went in [the living room], and that I was going to point my other gun at [Mirenna] and demand that he give me money. And then after he gave me money, then I was just going to let [Mirenna] know that I was just playing around; this is a joke." (Id. at 25).

Lehrman said that he then took his shotgun and pointed it at Mirenna, who was sitting on the couch in the living room, and "told him to give me his money." (Id.) According to Lehrman, Mirenna "looked at me as if I was joking and like I was playing around, and I pumped the shotgun, and I told him I wasn't playing around." (Id.) Lehrman said that he did not recall if Mirenna "made a comment or, you know, told me to stop playing or something, and I just shot him after that. In his foot." (Id.)

Lehrman testified that after he shot Mirenna in the foot, Mirenna "started yelling. And it scared me. I panicked." (Id. at 26). He further testified: "I told [Godesky] either to give me the gun or to shoot him. I–I can't remember exactly what I said to him. But [Godesky] just was standing there holding the gun." (Id.) Lehrman said that he then "grabb[ed] the gun off [Godesky]. And as I grabbed the gun, one shot went off." (Id.) Mirenna was "screaming," and Lehrman testified that he "just wanted him to be quiet." (Id.) Lehrman said that after he grabbed the gun from Godesky, he pointed it at Mirenna and shot him in the head. (Id.) After he fired that second shot, Lehrman said, it was clear Mirenna was dead. (Id. at 29).

Lehrman testified that the living room was small and, therefore, he and Godesky were not standing far from where Mirenna was sitting when Lehrman grabbed the pistol from Godesky and caused the first bullet to discharge from that gun. (Id. at 26-27). Lehrman said that when he fired the second and fatal shot into Mirenna's head, he was so close to Mirenna he was "[p]robably almost on top of him." (Id. at 26).

10

Erfort was not upstairs when the shooting started, Lehrman said. (Id. at 29). Lehrman testified that Erfort was "probably right around the doorway of the dining room.... [i]nto the living room." (Id.) In response to the question of whether Erfort was in the room when Lehrman grabbed the handgun from Godesky, Lehrman replied that Erfort "was present for the whole thing." (Id.)

When asked whether it had really been his intent to "prank" Mirenna, Lehrman replied: "I don't know what my intent was, to be honest. I–like, on some level, I thought I was going to shoot him, but at the same time I didn't know that I was going to shoot him until I actually did.... But I really didn't know what I was going to do until I actually did it." (Id. at 28).

Lehrman testified that after he shot Mirenna, Erfort and Godesky became scared, started yelling, and asked him why he did it. (Id. at 30). He said that he "really didn't have any explanation, so I just said it was an accident." (Id.) They disposed of Mirenna's body over the course of the next few days, and then Godesky and Lehrman "went [their] separate ways." (Id. at 38). Lehrman and Erfort "still hung out every day[,]" (id.) and, according to Lehrman, they eventually decided that if Mirenna's body was ever found they "were basically going to blame [Godesky] for the bulk of it." (Id. at 40-41).

Lehrman testified that after he was arrested on April 30, 1996, he talked to Erfort "a few times from the County Jail." (Id. at 41). He said that they "talked about the case, basically. And what [Erfort] needed to say" with respect to the plan to blame Mirenna's killing on Godesky. (Id.) Lehrman admitted that he did not tell the police the truth about Mirenna's death. (Id. at 44-45). He said he lied about what happened because he "didn't want to go to prison." (Id. at 44).

Lehrman also said that he lied when he testified at his own trial, and he acknowledged that for many years afterwards he denied his own involvement in Mirenna's death. (Id. at 52-54). He explained that eventually he began to wonder how his "life got to be this way[,]" realized how many people he had hurt, and decided he "wanted to right the wrongs that I've done." (Id. at 47). One of his mistakes, he

11

testified, was "getting [Godesky] a life sentence for something he didn't do." (Id. at 48). That is why, Lehrman said, he wrote his 2008 statement. (Id. at 48; Pet's Ex. 10).

When asked what contact he had with Godesky about this case, Lehrman responded, "[n]one." (Id. at 49). He said that no one has given him anything in exchange for his 2008 statement or for his testimony in support of Godesky's effort to get post-conviction relief in state and federal court. (Id. at 49-50). Lehrman also said that he did not anticipate that he would receive any benefit for testifying favorably for Godesky. (Id. at 50). He said that his DOC inmate account records, which date back to when he was initially incarcerated, show that "[Godesky] never gave me anything" and neither did anyone acting on his behalf. (Id.; Pet's Exs. 4A-4D). When asked whether he had anything to lose by testifying falsely, Lehrman said: "Not really. And I understand, you know, that it's easy to say, well [you are serving a life term], and you have nothing to lose.... But just because I don't have nothing to lose doesn't mean that I'm not telling the truth." (Id. at 51).

Lehrman acknowledged on cross-examination that he is currently housed at the residential treatment unit at SCI Somerset and that he has some mental health issues, for which he takes medication. (Id. at 55-59). He testified that his medication does not affect his memory. (Id. at 59). The Court credits that testimony and concludes that Lehrman's ability to accurately recall events and testify truthfully was not affected by his mental health issues or medications.

After Lehrman testified, Godesky called Davis, who is serving lengthy terms of imprisonment for burglary convictions. (Id. at 62). He had been an acquaintance of Erfort, Lehrman, and Mirenna around the time of Mirenna's killing. (Id. at 63-65, 68-69). The Court finds that Davis' testimony was credible and that it corroborated Lehrman's testimony that he and Erfort conspired to place false blame of Mirenna's murder onto Godesky.

12

Davis testified that Godesky was not part of the "Lehrman/Mirenna/Todd Erfort group of friends[.]" (Id. at 68-69). He said that Mirenna and Lehrman were drug dealers, (id. at 65), and that it was "big news" in the neighborhood when Mirenna was killed. (Id. at 67-68).

Davis said that he heard Erfort "bragging about basically killing Mirenna." (Id. at 69). On one occasion, Erfort stated that now that Mirenna was no longer around, Erfort and his group of friends, including Lehrman, were able to sell more drugs. (Id. at 70). On a second occasion, Davis testified, Erfort bragged about removing Mirenna from the drug scene, told another dealer "he owed him for basically getting Mirenna out of the way[,]" and said that he and Lehrman had a plan to "pass" the blame for Mirenna's murder onto someone else. (Id. at 72-73). Davis also described a conversation he had with Erfort in 1997. (Id. at 75-76). He said that Erfort told him that he and Lehrman's plan to "pass" the blame for Mirenna's murder did not work and "[Lehrman] ended up going to jail anyway." (Id. at 76).

Davis first came forward with his information in December 2003, when he signed an affidavit that contained information consistent with his testimony. (Id. at 77-78; Pet's Exs. 12, 13). He said that he did not come forward with his information in 1996 or 1997, when he was around 16 years old, because "[i]t never crossed [his] mind." (Id. at 77). Davis admitted that he and Godesky were incarcerated at the same state correctional institution from approximately 2000 to 2005 and that during that time they were cellmates for about two months in 2000. (Id. at 79). He said that he never read Godesky's legal papers, (id.), and that, aside from the two months when they shared the same cell, they were housed on "separate sides of the prison" and rarely saw each other. (Id. at 86). Davis testified that Godesky did not give him anything in exchange for his affidavits and testimony, nor did anyone acting on Godesky's behalf, as indicated by his DOC account statements. (Id. at 82-83; Pet's Ex. 5A-5D).

When Ford testified, he said that he had been friends with Mirenna, Lehrman, and Erfort. (Id. at 90). At the time of Mirenna's murder, he was 18 years old. (Id.) Godesky, Ford said, was "older and

13

hung in a completely different crowd." (Id.) Ford attended the party at Lehrman's house on February 28, 1996, and arrived to it with Mirenna and with Erfort's brother, Ray. (Id. at 91). Ford testified that he stayed at the party for only about an hour. (Id. at 92-93). He admitted that when he was subsequently questioned by the police, he told them that Erfort left the party at the same time that he did. (Id. at 97). Ford said that at the time he was trying to "cover for [Erfort].... Because by the time everything came out, I knew what was going on.... And I guess I was trying to look out for a friend." (Id.) Ford acknowledged that when he testified at Lehrman's 1997 trial he stated that Erfort had asked him to lie to the police. (Id. at 98-100).

Dr. Fowler was Godesky's final witness. He is a qualified expert in the field of forensic pathology. (Id. at 106; Pet's Ex. 6). Like Dr. Rozin, Dr. Fowler testified that there was soot around the wound that Mirenna sustained to the area near his left ear. (Id. at 113). That indicated to Dr. Fowler that the gun was discharged very close to Mirenna's head when he sustained that fatal wound. (Id. at 113-14). Dr. Fowler also testified that the gun was further away from Mirenna's head (between around 12 to 18 inches) when Mirenna sustained the wound to his left cheek. (Id. at 115). Dr. Fowler also made clear that he believed that two bullets were fired from the handgun, and that the wound to Mirenna's left wrist was defensive and the bullet that caused that wound traveled through Mirenna's left wrist and then struck him in the left cheek. (Id. at 110-12; Pet's Exs. 8A, 8C, and 9).

The Court credits Dr. Fowler's hearing testimony and finds that it was consistent with that given by Dr. Rozin at the trial in all relevant respects. Their testimonies support the Court's conclusion to credit the testimony that Lehrman gave at the evidentiary hearing, in which he explained that he was standing very close to Mirenna when he fired the second, and fatal, shot. Godesky has demonstrated that the forensic evidence is consistent with Lehrman's description of how the shooting occurred, and does

14

not support Erfort's trial testimony that Godesky fired twice at Mirenna in quick succession and from the same distance.

In conclusion, the Court finds that Godesky has produced credible evidence that Erfort committed perjury when he testified at Godesky's trial. Specifically, Godesky's credible evidence supports a finding that Erfort and Lehrman conspired to place false blame of Mirenna's murder onto Godesky, and that Erfort lied when he testified that Godesky deliberately shot and killed Mirenna during a robbery. It also supports the finding that, consistent with Godesky's defense at trial, Godesky thought Lehrman was only kidding about robbing Mirenna and, as Lehrman now admits, it was Lehrman, not Godesky, who deliberately shot and killed Mirenna.

## C. Conclusions of Law

The Court has jurisdiction under 28 U.S.C. § 2254, which is the federal habeas statute applicable to state prisoners. It permits a federal district court to issue the writ of habeas corpus if the state prisoner demonstrates that "he or she is in custody in violation of the Constitution…of the United States." 28 U.S.C. § 2254(a). It is Godesky's burden to prove that he is entitled to the writ. Id.; see, e.g., Vickers v. Superintendent Graterford SCI, 858 F.3d 841, 848-49 (3d Cir. 2017).

In Claim I(a) of the amended petition, Godesky contends that Erfort's perjury rendered his trial fundamentally unfair in violation of his due process rights. In support, Godesky relies upon Curran v. State of Delaware, 259 F.2d 707 (3d Cir. 1958). In Curran, the Court of Appeals affirmed the district court's grant of habeas relief on the basis of good faith use of perjured testimony. In that case, a police officer testified at the petitioner's trial regarding the existence of a statement. Evidence developed during the petitioner's subsequent post-conviction proceeding demonstrated that the officer's testimony was false. The Court of Appeals rejected the government's argument that "unless knowledge of such perjury is brought home to the prosecuting officers, there can be no basis for a finding of lack of due process in

15

a habeas corpus proceeding." Curran, 259 F.2d at 712-13. It held that the officer's perjured testimony "was sufficient to cause the defendants' trial to pass the line of tolerable imperfection and fall into the field of fundamental unfairness." Id. at 713. The Court concludes that Erfort's perjury had the same effect on Godesky's trial and, therefore, Godesky is entitled to a conditional writ of habeas corpus.

The Commonwealth argues that Curran is distinguishable because at Godesky's 1997 trial he had the opportunity to, and did, challenge Erfort's credibility by pointing out both Erfort's prior inconsistent statements and the motive he had to protect himself from being charged for his involvement in the crimes. The Commonwealth also argues that Godesky is not entitled to relief under Curran because Erfort's testimony does not rise to the level of perjury. The Court is not persuaded by the Commonwealth's arguments. It has already rejected the latter argument. As for the former, it is true that Godesky's trial attorney did attempt to undermine Erfort's testimony by using the evidence available to that defense at the time of Godesky's trial in 1997. But the credible evidence that Godesky introduced at the January 4, 2019, hearing was not available to Godesky's trial attorney because Lehrman did not make his confession until many years after the trial. That evidence, as the Court explained above, demonstrates that Erfort committed perjury when he testified at Godesky's trial, that Godesky did not conspire with Lehrman to rob Mirenna, and that it was Lehrman, not Godesky, who shot and killed Mirenna.

Based upon all of the foregoing, the Court concludes that Godesky has demonstrated a due process violation. Therefore, it will grant him a conditional writ of habeas corpus that directs that the Commonwealth may either retry Godesky or release him from his judgments of sentence.

Godesky also argues in Claim I(a) that he is entitled to the writ under the alternative theory that the Commonwealth knew or should have known that Erfort's trial testimony was false.[6] The Court rejects this argument because Godesky did not prove to the Court that the Commonwealth knew or should have known that Erfort committed perjury regarding what happened during the shooting, since it was not until more than a decade after Godesky's trial that Lehrman confessed that he and Erfort conspired to falsely blame Godesky for Mirenna's murder, that Godesky did not conspire to rob Mirenna, and that Lehrman was the one who intentionally shot and killed Mirenna.

Godesky further argues that, in addition to lying about the circumstances of the shooting, Erfort lied when he testified about an agreement he had with the Commonwealth and his understanding of the potential charges he faced if he did not cooperate with the prosecution. Godesky did not introduce any evidence at the January 4, 2019, hearing regarding any agreement, express or tacit, that the Commonwealth had with Erfort that was not disclosed to the defense. His allegations are based upon statements Erfort made when he testified at the 1997 trial. Therefore, Godesky could have litigated this issue in either his direct appeal or, at the very latest, his first PCRA proceeding (which concluded in 2003). The Court further notes that Godesky's trial attorney thoroughly questioned Erfort during cross-examination in order to apprise the jury of the inducement Erfort had to testify favorably for the prosecution and, therefore, jurors were able to take that information into consideration when they evaluated his credibility.[7]

---

[6] To prevail under this theory, Godesky must demonstrate that: (1) Erfort committed perjury; (2) the Commonwealth knew or should have known that his testimony was false and did not correct it; and (3) "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." Haskell v. Superintendent Greene SCI, 866 F.3d 139, 146 (3d Cir. 2017) (internal quotations and citations omitted).

[7] During his direct examination, Erfort acknowledged that he was told that, if he cooperated with the prosecution, he would not be charged with abuse of a corpse and crimes related to disposing of the murder weapon and cleaning up the scene of the crime. (Trial Tr. at 269). On cross-examination, Erfort first stated that he was told that he would not be charged with homicide, but in response to a later question he stated that the police had told him that he could face a homicide charge. (Id. at 276-77). Erfort was obviously being difficult, and Godesky's counsel asked him for clarification. Erfort said that he "wasn't

*Continued on next page*

17

In Claim I(b) of the amended petition, Godesky contends that, if the Court were to find no due process violation, he is entitled to habeas relief on a stand-alone claim that he is actually innocent of first-degree murder, robbery, and criminal conspiracy. This claim is denied because "[i]t has long been recognized that '[c]laims of actual innocence based on only newly discovered evidence' are never grounds for 'federal habeas relief absent an independent constitutional violation.'" Fielder v. Varner, 379 F.3d 113, 122 (3d Cir. 2004) (quoting Herrera v. Collins, 506 U.S. 390, 400 (1993)). However, because the Court of Appeals has stated in more recent decisions that the Supreme Court has not definitely resolved whether freestanding claims of actual innocence are cognizable, see, e.g., Reeves v. Fayette SCI, 897 F.3d 154, 160 n.4 (3d Cir. 2018) (citing McQuiggin v. Perkins, 569 U.S. 383, 392 (2013), petition for cert. filed (U.S. Oct. 22, 2018) (No. 18-543)), the Court will grant Godesky a certificate of appealability on this claim, which Godesky requires in the event the Commonwealth appeals and he files a cross-appeal.

Finally, in Claim II of the amended petition, Godesky contends that the prosecutor committed misconduct when he argued that the jury should convict him of first-degree murder based on forensic evidence that showed that three shots (not two) were fired from the murder weapon. Respondents are correct that this claim is procedurally defaulted because the Superior Court held in its 2013 opinion that

---

going to get charged with first degree murder because I ain't murder no one." (Id. at 280). Then, in response to yet another question on the topic, he indicated that he still thought there was the possibility that he could be charged with first degree murder. (Id.) In his closing argument, Godesky's counsel argued that the jury should not credit Erfort because, *inter alia*, he "was a co-conspirator in everything" and wanted to avoid prosecution. (Id. at 595). The prosecutor, in closing argument, said:
> [Erfort] could have easily been charged with abuse of corpse. Easily. By his own admission he could have been charged with hindering apprehension for helping dispose of the weapon and helping dispose of the body. Cover it up. Tearing up the carpet. Scrubbing the floors. Absolutely, but we needed a witness for you. And in the big realm of things, we needed him to testify. If you find that because he was offered that type of deal, if you will, or promise not to prosecute, although his understanding is he still could be, then don't listen to what he said. Disregard it immediately. But if what he says has a ring of truth to it in the crucial portions, you should listen to it, and I suggest it does.

(Id. at 609).

18

it was untimely under the PCRA's one-year statute of limitations. (ECF No. 55-8 at 9; ECF No. 69 at 29-30). Godesky contends that he can avoid that default under the actual innocence exception to procedural default recognized in Schlup v. Delo, 513 U.S. 298 (1995). (ECF No. 71 at 19). The Court need not resolve that issue as Claim II can be denied on the merits because the prosecutor did not mischaracterize the forensic evidence since Dr. Rozin did not reach any conclusion regarding the wrist wound. Additionally, even if Godesky had established that the prosecutor misstated the forensic evidence (he has not), any error was harmless because the Court does not believe that the prosecutor's argument regarding the wrist wound had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

## II.

For the foregoing reasons, the Court concludes that Godesky has demonstrated that he is entitled to habeas relief. Therefore, the Court will issue a conditional writ of habeas corpus. Within the time-frame set forth in this Court's conditional writ order, the Commonwealth may retry Godesky. If it does not, the superintendent respondent must release Godesky from the judgment of sentence he is serving for his convictions at criminal docket numbers CP-02-CR-6453-1996 and CP-02-CR-9689-1996.

An appropriate Order follows.

/s/ Susan Paradise Baxter
SUSAN PARADISE BAXTER
United States District Judge

Dated: April 26, 2019